Adam Van Susteren (Bar. No. 230512)
VAN SUSTEREN LAW GROUP
6641 Eldridge Street
San Diego, CA 92120
Telephone: (619) 549-5196
adam@vansusteren.com

Tyler Martinez*
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
Telephone: (703) 683-5700
tmartinez@ntu.org

*Admission Pro Hac Vice pending

Counsel for Amicus Curiae

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION**

| | |
|---|---|
| RUDOLPH "BUTCH" WARE, <br><br>                *Plaintiff,* <br><br> v. <br><br> SHIRLEY N. WEBER, in her official capacity as California Secretary of State, <br><br>                *Defendant.* | Case No. 2:26-cv-01643-WBS SCR <br><br> **BRIEF OF NATIONAL TAXPAYERS UNION FOUNDATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF** <br><br> Judge: Hon. William B. Shubb <br> Action Filed: April 27, 2026 |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTEREST OF *AMICI CURIAE* .......................................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 1

ARGUMENT ......................................................................................................................... 3

    I.    CALIFORNIA CANNOT DEMAND WHAT FEDERAL LAW PROTECTS. ....................... 3

        A. Congress Specifically Protects Tax Return Information from State Disclosure. .................. 3

        B. In Political Law, Financial Disclosure Demands Must Meet Exacting Scrutiny. ................. 7

CONCLUSION ...................................................................................................................... 13

CERTIFICATE OF SERVICE .............................................................................................. 14

i

**TABLE OF AUTHORITIES**

**Cases**

*Acorn Investments v. City of Seattle*,
887 F.2d 219 (9th Cir. 1989)..................................................................................9

*Alaska Airlines v. Brock*,
480 U.S. 678 (1987)...........................................................................................12

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)................................................................................. 6, 7, 10

*Aronson v Internal Revenue Serv.*,
973 F.2d 962 (1st Cir. 1992)................................................................................3

*Bates v. Little Rock*,
361 U.S. 516 (1960).......................................................................................7, 10

*Brown v. Socialist Workers '74 Campaign Comm.*,
459 U.S. 87 (1982)............................................................................................11

*Buckley v. Valeo*,
424 U.S. 1 (1976)..................................................................................... 7, 8, 10

*Church of Scientology v. Internal Revenue Serv.*,
484 U.S. 9 (1987)................................................................................................5

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)............................................................................................9

*Doe v. Reed*,
561 U.S. 186 (2010)............................................................................................9

*Duplantier v. United States*,
606 F.2d 654 (5th Cir. 1979)............................................................................10

*Fed. Election Comm'n v. LaRouche Campaign*,
817 F.2d 233 (2d Cir. 1987).............................................................................11

*Gamble v. United States*,
587 U.S. 678 (2019)............................................................................................4

*Gibson v. Florida Legislative Comm.*,
372 U.S. 539 (1963)............................................................................................7

*Lady J. Lingerie v. City of Jacksonville*,
176 F.3d 1358 (11th Cir. 1999).........................................................................11

*McConnell v. Fed. Election Comm'n*,
251 F. Supp. 2d 176 (D.D.C. 2003) ........................................................................ 9

*McConnell v. Fed. Election Comm'n*,
540 U.S. 93 (2002) ........................................................................................ 8

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185 (2014) ...................................................................................... 8

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) .................................................................................. 7, 10

*NAACP v. Button*,
371 U.S. 415 (1963) ...................................................................................... 7

*Nixon v. Shrink Mo. Gov't PAC*,
528 U.S. 377 (2000) ...................................................................................... 8

*O'Brien v. DiGrazia*,
544 F.2d 543 (1st Cir. 1973) .......................................................................... 11

*Patterson v. Padilla*,
8 Cal. 5th 220 (2019) .................................................................................... 12

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*,
699 F.3d 962 (7th Cir. 2012) ........................................................................... 6

*Plante v. Gonzalez*,
575 F.2d 1119 (5th Cir. 1978) ........................................................................ 10

*Shelton v. Tucker*,
364 U.S. 479 (1960) .................................................................................. 7, 10

*Stokwitz v. United States*,
831 F.2d 893 (9th Cir. 1987) ........................................................................... 5

*Talley v. California*,
362 U.S. 60 (1960) ....................................................................................... 7, 9

*Toll v. Moreno*,
458 U.S. 1 (1982) ......................................................................................... 6

*United States v. Janis*,
428 U.S. 433 (1976) ...................................................................................... 4

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) ...................................................................................... 8

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
536 U.S. 150 (2002) ................................................................................................. 8

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ............................................................................................... 10

*Wis. Right to Life, Inc. v. Barland*,
751 F.3d 804 (7th Cir. 2014) .................................................................................. 8

**Statutes**

26 U.S.C. § 6103 .................................................................................................. 3, 5

26 U.S.C. § 6103(d)(1) ............................................................................................ 6

26 U.S.C. § 6103(d)(5) ............................................................................................ 6

26 U.S.C. § 6103(d)(6) ............................................................................................ 6

26 U.S.C. § 6103(d)(7) ............................................................................................ 6

26 U.S.C. § 6103(d)(13) .......................................................................................... 6

26 U.S.C. § 6104 ..................................................................................................... 5

26 U.S.C. § 7213(a)(1) ............................................................................................ 6

26 U.S.C. § 7213(a)(2) ............................................................................................ 6

26 U.S.C. § 7216 ..................................................................................................... 6

26 U.S.C. § 7431 ..................................................................................................... 6

**Other Authorities**

Impeachment Of Richard M. Nixon, Articles of Impeachment, II(2),
H. REPT. 93-1305 (1974) ........................................................................................ 4

J.T. Manhire, *What Does Voluntary Compliance Mean? A Government Perspective*,
164 U. PENN. L. REV. ONLINE 11 (2015) ............................................................... 3

STATEMENT OF THE JOINT COMMITTEE ON TAXATION, 94TH CONG., GENERAL EXPLANATION
OF THE TAX REFORM ACT OF 1976 ....................................................................... 5

## INTEREST OF *AMICI CURIAE*

Founded in 1973, the National Taxpayers Union Foundation ("NTUF") is a non-partisan research and educational organization dedicated to showing Americans how taxes, government spending, and regulations affect everyday life. NTUF advances principles of limited government, simple taxation, and transparency on both the state and federal level. NTUF's Taxpayer Defense Center advocates for taxpayers in the courts, produces scholarly analyses, and engages in direct litigation and *amicus curiae* briefs upholding taxpayers' rights and challenging administrative overreach by tax authorities. NTUF has extensive expertise on the constitutional and practical application of taxpayer privacy laws in matters such as these. NTUF was cited in the recent decision upholding the right to assert privacy against state subpoena demands in *First Choice Women's Resource Centers v. Davenport*, 608 U.S. ___, slip op. at 12–13 (No. 24-781, Apr. 29, 2026). NTUF has also served as *amicus* in cases around the country. *See, e.g., Buckeye Inst. v. Internal Revenue Serv.* (6th Cir. No. 25-3107) (decision pending); *Nat'l Small Bus. United v. U.S. Dep't of the Treasury*, 161 F.4th 1323 (11th Cir. 2025); *Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024); *see also Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023). Accordingly, *Amicus* has an institutional interest in this case. Plaintiff consents to the filing of this brief; Defendant stated they do not object. [1]

## SUMMARY OF ARGUMENT

Any law mandating disclosure of tax returns is an extraordinary law. Never before, in sixty presidential elections, tens of thousands of House and Senate elections, thousands of Governor elections, and well over a million combined state and local elections, has forced disclosure of tax returns been made mandatory. Given the vital taxpayer interest in financial privacy and the government

---

[1] *Amicus Curiae* confirms that this brief was not authored in whole or in part by counsel for any party, and no person or entity other than *Amicus* and its counsel made a monetary contribution to the preparation or submission of this brief. *Amicus* further states that, as a § 501(c)(3) organization, it has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

interest in upholding that privacy to foster compliance, only the most significant compelling interest could possibly change this long-standing precedent in over one million elections.

The state has not explained why its new disclosure regime satisfies the exacting scrutiny standard demanded by the U.S. Supreme Court for forced financial disclosure regimes. Nor has it offered explanation as to why forcing disclosure of five years of tax returns strikes the right balance in furthering an asserted governmental interest. The state has failed to offer less restrictive means, rather, it would set a precedent that would have chilling effects on fundamental rights. Consider down ballot elections, where a mother may wish to run for school board, but her income is either higher or lower than her neighborhood and letting that information out could embarrass her and prevent her from running for office. While a candidate for Governor might be more prepared for that level of scrutiny, once tax returns privacy is not sacrosanct, they are not sacrosanct. If five years does not yield the information required, can it expand to six, to ten, to every return ever filed? If tax returns are not protected, could family members of candidates be required to disclose theirs too? The state will likely argue, that's absurd, Amicus agrees – it is absurd for any non-financial governmental body to be able to force access any tax returns.

A precedent that California may force disclosure of private financial information as a condition of running for office will not only have a chilling effect on protected First Amendment activity, but also Article I Section I of the California Constitution provides the right to privacy. In our era of hotly contested politics and cancel culture, the prospect of having tax returns out in the public is a serious invasion of privacy. While forced disclosure of financial information to tax authorities serves an obvious important governmental interest, that is not the case with forced disclosure to the Secretary of State or the Attorney General. No other government entity has the same compelling interest of financial disclosure as the IRS or the Franchise Tax Board. And those entities protect the privacy of the returns

vociferously. Our tax returns are not meant to be fodder for politics; they are meant to be private so that a fair accounting can be done.

Every citizen—including Mr. Ware—has a right to financial privacy to their tax returns. Because of that fundamental privacy right, the Secretary's disclosure demand must satisfy the exacting scrutiny standard. But the Secretary fails, obviously, since over a million elections did not require tax returns to be fair, and for those reasons and others more fully advanced herein, this Court should invalidate the remaining part of the statute not already invalidated by the state supreme court, and grant Mr. Ware his requested relief.

**ARGUMENT**

**I.      CALIFORNIA CANNOT DEMAND WHAT FEDERAL LAW PROTECTS.**

The State argues that "the actual burden of complying with the tax return disclosure requirement is slight." Def. Opp. To Pl. Mot. for a Temp. Rest. Order and Prelim. Inj. at 13 ("State Brief"). So is handing over your baby to someone else, the effort of handing over the baby is nothing, but the idea of putting your baby in the care of someone else is anything but slight. This is exactly why the Constitution and Congressional statute say otherwise. Congress, in the wake of Watergate, has long limited the ability of state and federal actors to obtain protected tax information. And the Supreme Court has long resisted the use of financial disclosures as a means of policing the ability of exercising First Amendment rights. Combined, the case law and federal statute preclude California's demand of protected tax return information before a person may become a candidate on the ballot.

In 1992, then-Chief Judge Stephen Breyer described the interests involved in this case, recognizing that "Congress has decided that, with respect to tax returns, confidentiality, not sunlight, is the proper aim." *Aronson v Internal Revenue Serv.*, 973 F.2d 962, 966 (1st Cir. 1992) "taxpayers might wish not to have broadcast." *Id*. And privacy of tax return information promotes tax compliance. *See id*. ("[W]ithout clear taxpayer understanding that the government takes the strongest precautions

to keep tax information confidential, taxpayers' confidence in the federal tax system might erode, with harmful consequences for a tax system that depends heavily on voluntary compliance").

The primary means of protecting tax returns and the sensitive information they contain is found in 26 U.S.C. § 6103.  The interests of the federal tax system are usually aligned with the "citizen's right to privacy." That is the necessary result of the reliance on voluntary compliance to close the persistent "tax gap" between the tax properly due and the amount the IRS receives. *See, e.g.*, J.T. Manhire, *What Does Voluntary Compliance Mean? A Government Perspective*, 164 U. PENN. L. REV. ONLINE 11, 15 n.24 (2015) (estimating the United States's voluntary compliance rate as the highest in the world).

But what happens to taxpayer confidence when a State uses federal tax information in a way that federal law would not permit? Most taxpayers will likely not distinguish between a State official revealing information on a federal tax form and a federal official doing so, since the effect on privacy in an Internet era would likely be the same. *See, e.g.*, Former IRS Commissioner Lawrence Gibbs, "INSIGHT: Let's Not Forget There's a Reason for Keeping Tax Returns Private," *Daily Tax Report*, BLOOMBERG TAX (Aug. 14, 2019)[2]  ("Taxpayers are likely to decide that if the IRS cannot protect the privacy and confidentiality of even the president's returns and tax information, no one else's returns and tax information can be protected. In turn, taxpayers predictably are likely to be less willing than they previously have been to provide information requested by the IRS in tax returns."). *See also United States v. Janis*, 428 U.S. 433, 444, 459 (1976) (discussing "silver-platter doctrine" of sharing information between dual sovereigns); *Gamble v. United States*, 587 U.S. 678, 708–09 (2019) (same).

Many of the biggest controversies affecting taxpayer confidence involve misuse of the tax system by politicians and elected officials. One of the charges that helped drive President Richard

---

[2] *Available at*: https://news.bloombergtax.com/daily-tax-report/insight-lets-not-forget-theres-a-reason-for-keeping-tax-returns-private.

Nixon from office in 1974 was using the Internal Revenue Service ("IRS") against his "enemies list." *See* Impeachment Of Richard M. Nixon, Articles of Impeachment, II(2), H.REPORT 93-1305, at 3 (1974) ("He has, acting personally and through his subordinates and agents, endeavored to obtain from the Internal Revenue Service, in Violation of the constitutional rights of citizens; confidential information contained in income tax returns for purposes not authorized by law, and to cause, in violation of the constitutional rights of citizens, income tax audits or other income tax investigations to be initiated or conducted in a discriminatory manner."). Those abuses sparked, among other things, tax confidentiality provisions in 26 U.S.C. ("Internal Revenue Code" or "IRC") § 6103 and the limits in IRC § 6104 on releasing donor information.

Section 6103 was added by the Tax Reform Act of 1976, which overhauled the rules governing the privacy of federal tax returns. Prior to 1976, income tax returns were public records. In response to the abuses of power revealed by the Watergate scandal and the resulting loss of public confidence, Congress enacted a general rule that the government is to keep tax returns and tax return information confidential except as specifically provided by the Internal Revenue Code, and increased protections against disclosure by the IRS. *See*, *e.g.*, *see also Church of Scientology v. Internal Revenue Serv.*, 484 U.S. 9, 16 (1987) ("One of the major purposes" of the 1976 revisions to § 6103 "was to tighten the restrictions on the use of return information by entities other than [the IRS]"); *Stokwitz v. United States*, 831 F.2d 893, 894 (9th Cir. 1987) ("Congress's overriding purpose was to curtail loose disclosure practices by the IRS. Congress was concerned that IRS had become a 'lending library' to other government agencies of tax information filed with the IRS, and feared the public's confidence in the privacy of returns filed with IRS would suffer.") (citations omitted). That is because, "the IRS probably has more information about more people than any other agency in this country. Consequently, almost every other agency that has a need for information logically seeks it from the IRS." *Id*. (citation omitted)

(cleaned up). If the taxpayer confidence problem was big enough to affect a President in the 1970's, it's much, much bigger now in the digital age.

Therefore 26 U.S.C. § 6103 generally protects tax returns and the information they contain from disclosure outside of the tax context. That was Congress' goal. *See*, STATEMENT OF THE JOINT COMMITTEE ON TAXATION, 94TH CONG., GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1976, 314. To be sure, there are numerous exceptions, but none apply here because those are focused matters of *financial* concern—state tax reporting, employment tax reporting, child support, welfare, student loan eligibility, and the like. *See*, *e.g.*, 26 U.S.C. §§ 6103(d)(1), (d)(5), (d)(6), (d)(7), and (d)(13). Financial privacy is also presumed throughout federal tax law, which bars officials from releasing private donor information, intentionally or otherwise. The Internal Revenue Code provides stiff penalties for the unauthorized inspection and/or disclosure of tax return information. *See*, *e.g.*, 26 U.S.C. §§ 7213(a)(1) (criminal sanctions for disclosure of returns or return information by federal employees); 7213(a)(2) (criminal sanctions for disclosure of returns or return information by state officials); 7216 (criminal sanctions for disclosure of tax return or return information by tax preparers). Congress provided for civil relief too. *See*, *e.g.*, 26 U.S.C. § 7431 (civil damages for unauthorized inspection or disclosure of returns or return information).

With this background in mind, it may seem that § 6103 is merely for state official requests to the IRS. But courts do not allow the state to do an end-run around the law by simply demanding the information directly from the citizen instead. *See*, *e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) ("*AFPF*") (noting that "[t]he point is that a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary…."); *Toll v. Moreno*, 458 U.S. 1, 16 (1982) (holding that a state may not evade federal tax exemption provided to G-4 visa holders by denying in-state tuition to the children of such visa

6

holders, because "[t]he State may not recoup indirectly from respondents' parents the taxes that the Federal Government has expressly barred the State from collecting"); *see also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 978 (7th Cir. 2012) (Indiana's claim of "plenary authority to exclude Medicaid providers for any reason, as long as it furthers a legitimate state interest" is preempted by Medicaid's guarantee of a free choice of provider, because "[i]f states are free to set any qualifications they want—no matter how unrelated to the provider's fitness to treat Medicaid patients—then the free-choice-of-provider requirement could be easily undermined by simply labeling any exclusionary rule as a 'qualification'").

The Congressional bar on the IRS becoming a "lending library" for whatever government official wants to know about the finances of a citizen must be upheld. It is for the voters to decide if a candidate's reluctance to furnish their tax returns is disqualifying for state office. Given the history of abuse and careful delineation of what happens to tax return information today, this Court should be wary of approving a system that demands intrusive exposure, simply for ballot access.

In Political Law, Financial Disclosure Demands Must Meet Exacting Scrutiny.

Under *AFPF* and other landmark cases dating back to the Civil Rights Era,[3] the government must show a disclosure demand survives "exacting scrutiny."[4] Exacting scrutiny "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest" and "the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594

---

[3] *See*, *e.g.*, *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam); *Gibson v. Florida Legislative Comm.*, 372 U.S. 539 (1963); *Talley v. California*, 362 U.S. 60 (1960); *Shelton v. Tucker*, 364 U.S. 479 (1960); *Bates v. Little Rock*, 361 U.S. 516 (1960); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958). To be sure, many of these cases are about donor privacy to non-political nonprofit groups, but nonetheless the principle still stands that a state may not precondition public engagement only by complying with burdensome and intrusive financial disclosure requirements.

[4] Furthermore, the government's informational interest, which is typically identified as its interest in campaign finance disclosure cases decided under exacting scrutiny, has never been recognized as a *compelling* interest satisfying strict scrutiny. *See e.g., Buckley*, 424 U.S. at 66.

U.S. at 611. Political rights must be protected "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference" such as registration and disclosure requirements and the attendant sanctions for failing to disclose. *Bates*, 361 U.S. at 523; *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (noting that political freedoms under the First Amendment are "delicate and vulnerable" to "[t]he threat of sanctions [which] may deter their exercise almost as potently as the actual application of sanctions").

Exacting scrutiny is "not a loose form of judicial review." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 840 (7th Cir. 2014). It is instead a "strict test," *Buckley*, 424 U.S. 66, requiring an analysis of the burdens imposed, and whether those burdens advance the government's stated interest because, "[i]n the First Amendment context, fit matters." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014) (Roberts, C.J., controlling opinion). Such heightened review ensures that laws do not undermine "the values protected by the First Amendment." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165-66 (2002).

If a law impacting core First Amendment freedoms is novel, and not merely a retread of already-approved interests and tailoring, then the government must provide concrete evidence that the new law also survives the heightened scrutiny. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised"). And the high Court has rejected "mere conjecture as adequate to carry a First Amendment burden." *Id*. at 392. Instead, the government must prove the strength of its interest. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995) ("[W]hen the Government defends a regulation on speech as a means to… prevent anticipated harms, it must do more than simply posit the existence of a disease sought to be

8

cured. It must demonstrate that the recited harms are real, not merely conjectural") (citation and punctuation omitted).

What does such a showing of substantial interest look like? Congress sought to significantly expand the disclosure regime for campaign-related speech, regulating "candidate advertisements masquerading as issue ads" that aired shortly before an election. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 132 (2002) (citation and quotation marks omitted). In campaign finance parlance, these are known as "electioneering communications" and, prior to 2002, were never regulated. Applying exacting scrutiny, that innovation required a significant showing, and the government needed to build a 100,000-page record in order to demonstrate that, at least facially, its law was appropriately tailored to a real and concrete problem. *McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 209 (D.D.C. 2003) (three-judge court) (per curiam); *cf. Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 332 (2010) (discussing and citing 100,000-page record amassed by dozens of litigants in *McConnell*). California has made no comparable showing here to justify its forced disclosure of private taxpayer information.

In evaluating the informational interest commonly asserted by governments courts must examine whether "the strength of the governmental interest . . . reflect[s] the seriousness of the actual burden on [a party's] First Amendment rights." *Doe v. Reed*, 561 U.S. 186, 196 (2010). Here, there is no real limiting principle. California demands 5 years of tax returns—longer than the term of office for Governor, which is the office Mr. Ware desires. The State has not explained why 5 years of forced disclosures strikes the right balance, or even how forced disclosures best further any asserted interest. Instead, it merely asserts that the burden is slight and someone, somewhere, has an interest in the financial disclosures. *See, e.g.*, State Brief at 13. But it is the *government*'s burden to show why disclosure is needed. *See, e.g., Talley*, 362 U.S. at 65 (striking down city ordinance requiring the

identification of persons who prepared, distributed, or sponsored handbills on the condition of public distribution as overbroad); *Acorn Investments v. City of Seattle*, 887 F.2d 219, 225–26 (9th Cir. 1989) (declaring municipality's shareholder disclosure regime for certain adult businesses unconstitutional without such a *prima facie* showing).

Indeed, the Civil Rights era cases on donor privacy were generated by generally-applicable business statutes that could be banally described as mere routine disclosure of financial records. *NAACP* centered on the state's use of foreign corporation registration statutes as a means of getting the civil rights group's donor list. *See NAACP*, 357 U.S. at 451. *Bates*, 361 U.S. at 517, examined the city's use of business license tax registration. *Shelton*, 364 U.S. at 481, dealt with employment paperwork to be employed as schoolteacher. *AFPF*, 594 U.S. at 600, centered on what should be routine charities registration with the Attorney General of California. But financial records are deeply personal and "financial transactions can reveal much about a person's activities, associations, and beliefs." *Buckley*, 424 U.S. at 96 (cleaned up, citation omitted).

Nor does Mr. Ware's status as a candidate change his right to financial privacy as a taxpayer and a citizen. In *Plante v. Gonzalez*, 575 F.2d 1119, 1121 (5th Cir. 1978), members of the Florida Legislature challenged a state constitutional amendment requiring extensive financial and tax return disclosures from elected officials. This was the result of "[p]olitical scandals [that] rocked Florida in the seventies." *Id*. at 1122; *see also id*. at 1122 n.3 (detailing scandals). The Fifth Circuit recognized the right to financial privacy: "Ranged against these important interests are the senators' interests in financial privacy. *Their interest is substantial*." *Id*. at 1135 (emphasis added). The Fifth Circuit further held that "[f]inancial privacy is a matter of serious concern, deserving strong protection." *Id*. at 1136. The challengers there were "not ordinary citizens, but state senators," and while that did "not strip them of all constitutional protection" from disclosure of their finances, it did "put some limits on the privacy

10

they may reasonably expect." *Id*. at 1135. A year later, the same Circuit recognized privacy interests in financial data for federal judges, but the jurists lost there because they were public servants in a uniquely untouchable role. *Duplantier v. United States*, 606 F.2d 654, 670 (5th Cir. 1979) ("Like the state senators in Plante, judges are not ordinary citizens but are rather people who have chosen to accept public office.") (quotation marks removed); *see also Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445– 46 (2015) (recogniz[ing] the "vital state interest" in safeguarding "public confidence in the fairness and integrity" of judges because "[u]nlike the executive or the legislature, the judiciary has neither force nor will but merely judgment… [that] depends in large measure on the public's willingness to respect and follow its decisions.") (cleaned up, citations omitted).

In *O'Brien v. DiGrazia*, 544 F.2d 543, 545 (1st Cir. 1973), the Boston Police Commissioner suspected some of his officers of involvement in organized crime. He therefore demanded that the patrolmen fill out a financial questionnaire "listing all sources of income in 1972 for themselves and their spouses, all significant assets held by them and any members of their households, and, for the years 1966 through 1971, a general estimate of their expenditures and copies of their state and federal income tax returns." *Id*. Officers who refused to supply the information were suspended, and asserted a right to privacy based on the Fourth, Fifth, Seventh, and Fourteenth Amendments. *See id*. Assuming, without deciding, that there was such a privacy interest, the court ultimately held that the governmental interests in an honest police force outweighed the privacy interest for those specific officers in that specific instance. *See id*. at 546.

These cases on financial privacy protect not only political dissent, *see e.g.*, *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982), but also simple privacy in investments. For instance, the Eleventh Circuit ruled that a city violated the First Amendment when it sought to "require[] corporate applicants for adult business licenses to disclose the names of 'principal

stockholders'" privately to a regulatory agency, and invalidated the ordinance when the agency was unable to demonstrate a sufficient need for that information. *Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1366, 1367 (11th Cir. 1999) (citation omitted). Likewise mere assertion of the need for information for an investigation is not enough, alone, to survive exacting scrutiny. For example, in *Federal Election Commission v. LaRouche Campaign*, 817 F.2d 233 (2d Cir. 1987), the Second Circuit reversed the district court for requiring proof of "reprisals, harassment, or threats," and required the government to show a need for private information "beyond its mere relevance to a proper investigation." *Id*. at 234–35. The presumption remains that financial information remains private.

Mr. Ware is not alone in finding this requirement burdensome and unconstitutional. As the California Supreme Court held for presidential primaries, state law must allow voters to "choose among a complete array of candidates found to be recognized candidates throughout the nation or throughout California… who had not filed affidavits of noncandidacy to remove themselves from the ballot." *Patterson v. Padilla*, 8 Cal. 5th 220, 224 (2019). *Patterson* focused primarily on the aspect of allowing voters access to presidential candidates (specifically Mr. Trump), under California Constitution article II, section 5(c). But its reasoning and support for allowing voters a broad choice of candidates remains intact. *Id*. at 225 ("article II, section 5(c) embeds in the state Constitution the principle that, ultimately, it is the voters who must decide whether the refusal of a "recognized candidate[ ]… to make such [tax] information available to the public will have consequences at the ballot box.").[5]

In all instances the First Amendment requires some weighty interest from the state in the specific disclosure it mandates. It cannot be based on mere conjecture but must be supported by a robust

---

[5] The relevant statute was partly invalidated in *Patterson*, *id*. at 225, but because the statute lacks a severability clause, the remainder should not stand unless there is a judicial finding that legislators intended the remainder of the statute to be able to stand independently. *See, e.g.*, *Alaska Airlines v. Brock*, 480 U.S. 678, 685-86 (1987) (holding that in the absence of a severability clause, a statute should stand if it "will function in a manner consistent with the intent" of lawmakers).

record. And then that disclosure regime must be shown to be tailored to that specific interest. California has not shown why it needs five years of a candidate's tax records merely for access to the ballot, nor has it shown how the scope of information, the length of time, and the need for disclosure is tailored to any weighty interest.

**CONCLUSION**

For the foregoing reasons, *Amicus* respectfully requests this Court grant the preliminary relief Mr. Ware seeks in this case and declare the tax return disclosure mandate unconstitutional.

Respectfully submitted,

s/ Tyler Martinez

Adam Van Susteren (Bar. No. 230512)
VAN SUSTEREN LAW GROUP
6641 Eldridge Street
San Diego, CA 92120

Tyler Martinez*
NATIONAL TAXPAYERS UNION FOUNDATION
122 C Street N.W., Suite 700
Washington, D.C. 20001
Telephone: (703) 683-5700
tmartinez@ntu.org

* *Admission* pro hac vice *pending*

Dated: May 6, 2026

*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing using the court's CM/ECF system. A Notice of Docket Activity will be emailed to all registered attorneys currently participating in this case, constituting service on those attorneys.

s/ Adam Van Susteren
Adam Van Susteren (Bar. No. 230512)
*Counsel for* Amicus Curiae

Dated: May 6, 2026